**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| FELIPE MIRANDA | § | |
| | § | **CIVIL CASE NO.**_____ |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | **JURY TRIAL DEMANDED** |
| NADA HOLDINGS, INC., | § | |
| | § | |
| *Defendant.* | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

TO THE HONORABLE JUDGE OF THIS COURT:

Plaintiff Felipe Miranda files this Original Complaint against Defendant Nada Holdings, Inc., and in support states as follows:

**NATURE OF ACTION:**

1.    <u>FLSA Claim - Failure to Pay Minimum Wage or Overtime</u>:  Mr. Miranda bring this action to recover minimum wage & overtime compensation owed to him for the work he performed during 2018, 2019, and 2020, for the multiple periods in which he worked without pay, pursuant to the Fair Labor Standards Act ("FLSA") (29 U.S.C. § 201, et seq.).

2.    <u>Retaliation for Reporting FLSA Violations:</u>  Mr. Miranda was promptly  fired when he submitted complaints to company owners about their failure to pay minimum wage, as required by law.  He therefore seeks to recover wrongful termination damages under the FAIR LABOR STANDARDS ACT, Section 15(a)(3).

3.    <u>Retaliation for Reporting Fraud:</u>  Mr. Miranda was promptly fired when he sub-mitted complaints to company owners about what he believed in good faith to be fraud on the U.S. Government - specifically, misuse of PPP funds, and encouraging employees to draw CARES Act unemployment benefits in lieu of being paid wages by the company.  He therefore seeks to recover wrongful termination damages under the FALSE CLAIMS ACT.


# I.  PARTIES

4.    Plaintiff Felipe Miranda resides in Dallas County, Texas.  He is a former employ-ee of the Defendant, Nada Holdings, Inc.

5.    Defendant Nada Holdings, Inc. (*d/b/a* "Nada Platform, Inc.") is a foreign corpora-tion headquartered, and doing business at, 2512 Boll St., Dallas TX 75204.  Its directors are John Green and Mauricio Delgado, both residing in Dallas, TX.   It can be served via its registered agent for service in Texas, New Order Financial Services, Inc., 8445 Freeport Parkway, Ste. 175, Irving TX 75063.


# II.  JURISDICTION AND VENUE

6.    Mr. Miranda is a whistleblower. Nada fired Mr. Miranda from his job because he raised complaints about fraud being committed by Nada upon the United States Government, the State of Texas, and its own investors.

7.    This action arises, in part, under the anti-retaliation provision of the FALSE CLAIMS ACT.  31 U.S.C. §3730(h).  This Court has jurisdiction over this action pursuant to 31 U.S.C. Section 3732(a).  This Court also has jurisdiction because Plaintiff's claim is based on

federal cause of action: the anti-retaliation provision of the FALSE CLAIMS ACT.   28 U.S.C. §1331, and the Fair Labor Standards Act.

8.     Venue is proper in the Northern District of Texas, where a substantial part of the events or omissions giving rise to Plaintiff's claims occurred.  28 U.S.C. §1391(b)(2).  All individuals involved in this dispute are residents of Dallas County, Texas.

### III.  FACTS

**July 1, 2018 - December 1, 2018:  Plaintiff Works Full Time Without Pay.**

9.     Mr. Miranda started working for Nada in July of 2018.

10.     From July 1, 2018 until December 1, 2018, he worked full time for Nada, without any compensation.

11.     He was given an email address starting July 1, 2018, but was not given a formal job title at this time.  His job duties included business development, website development & product development, connecting with vendors (and other "B2B" relationships), and proposing ideas for the company launch.  The company had a co-working space that Mr. Miranda went to every day to work.

12.     As part of his work, Mr. Miranda directly and regularly engaged in interstate commerce.  He regularly made calls to vendors in other states, & helped to secure services from out-of-state providers.  Mr. Miranda worked remotely in Mexico as well and spoke to vendors there.

13.     When Mr. Miranda began working for Nada in July 2018, he was receiving work-er's compensation Supplemental Income Benefits (SIB's) due to a work-related injury at a prior job.

14.     Mauricio Delgado, Nada's CSO, advised Mr. Miranda that he would lose his SIB's if Nada Holdings paid him a salary, so it was better if he just continued to draw those benefits, instead of receiving an appropriate salary from Nada.

15.     Unbeknownst to Mr. Miranda at the time, this advice was incorrect.  Mr. Miranda could have received a salary from Nada, and still continued to draw his SIB's - there simply would've been an offset to the SIB's to account for the income he earned with Nada.

16.     Unfortunately, Mr. Miranda took Mauricio's word for it, and simply accepted Nada's proposal to have him work for free for 5 months.  As a result of Mauricio's deception, Nada was able to benefit from 5 months of Mr. Miranda's full time work efforts without having to pay him a dime.

17.     Under the Fair Labor Standards Act ("FLSA"), Mr. Miranda was entitled to be paid at least minimum wage for his work during this time.  He was not.

18.     Nada cannot now claim that Mr. Miranda was exempt under the FLSA, because it did not pay Mr. Miranda on a salary basis.

19.     Mr. Miranda was an employee, not an independent contractor, during this time period - a fact that is indisputable in light of the following:

- He was never presented with an independent contractor agreement for the work he performed for Nada Holdings Inc.;

- His services for Nada were an integral part of Nada's business;

- He made no investment in his own facilities or equipment - all of his work was done using Nada's systems and software, for Nada's benefit;

- He was dependent on Nada for work assignments - he did not select his own projects;

- He did not select his own work hours, and was directed to work during particular days and times;

- All of his work was directed and controlled by Nada's executives, and was subject to their approval;

- He had no opportunity for profit or loss in any sort of independent business;

- He was not organized as an independent business, and did not operate as an independent business;

- He did not market his services to others and worked solely and exclusively for Nada.

20.     In 2020, Nada wrote a letter to Mr. Miranda stating: "Your contributions during the period of July to December of 2018 were appreciated and we find it most accurate to refer to this period as your internship with the Company." This was a post-hoc attempt to justify the lack of wages. But this was not a legally valid "internship." The Department of Labor has a six-factor test (see "Fact Sheet #71: Internship Programs Under The Fair Labor Standards Act") for determining when an employer can legally run a "unpaid internship" program. None of those factors were met here:

| DOL Factors | Miranda's Work for Nada |
|---|---|
| "The internship, even though it includes actual operation of the facilities of the employer, is similar to training which would be given in an educational environment."<br><br>(Additional DOL Guidance: "Does it teach skills that can be used in multiple employment settings, as opposed to skills particular to one employer's operation?") | Mr. Miranda was performing regular, compensable work that directly benefited the company. This was not an "educational opportunity" for Mr. Miranda, and he was not given any training similar to what would be given in an educational environment. |
| "The internship experience is for the benefit of the intern." | Mr. Miranda's work was solely for the benefit of the Company. |
| "The intern does not displace regular employees, but works under close supervision of existing staff." | Mr. Miranda was a regular, integral part of the staff. He was not "shadowing" anyone or acting as a "learner" or "apprentice." |
| "The employer that provides the training derives no immediate advantage from the activities of the intern; and on occasion its operations may actually be impeded." | Nada derived immediate advantage from Mr. Miranda's work - he was a regular, full time contributor, creating usable work product for the company. |
| "The intern is not necessarily entitled to a job at the conclusion of the internship."<br><br>(Additional DOL Guidance: "unpaid internships generally should not be used by the employer as a trial period for individuals seeking employment at the conclusion of the internship period."). | All parties were aware of - and explicitly discussed - the fact that Mr. Miranda was going to become a "regular" employee once they had the money. There was never any expectation that this supposed "internship" would end without a job for Mr. Miranda. |
| "The employer and the intern understand that the intern is not entitled to wages for the time spent in the internship." | This was openly discussed by Mauricio Delgado, as set forth above. But in light of the other factors, and the fact that Mr. Miranda only agreed to this because he was misled, this factor should be given little weight. |

21.     In sum - Mr. Miranda was permitted to perform full time, non-exempt work for Nada.  He was not an independent contractor or an "intern."  He was legally entitled to be paid at least $7.25 per hour for his work (e.g., at least $6,380.00 for 40 hours/week during the time period of 07/01/2018-11/30/2018). He also worked approximately 200 overtime hours during this period, and therefore should have been paid an additional $2,175.00 in overtime pay.  He was instead paid nothing.

22.     Nada did not do this in in good faith - it *knew* it should be paying Mr. Miranda. They had specific discussions about whether to pay Mr. Miranda and conned him into believing he'd be "better off" just working for free so he could continue receiving his SIB's.

23.     Nada had no reasonable grounds for believing that this was not a violation of the FLSA.

24.     Mr. Miranda told the company on several occasions during his employment that it was unlawful not to pay employees for their work.  Nada ignored him.

25.     Nada's FLSA violation was willful.  It either knew, or showed reckless disregard as to whether, this choice was unlawful.   Mr. Miranda therefore invokes the FLSA's 3-year statute of limitations for this violation. 29 U.S.C. § 255(a).

**December 1, 2018 to March 2019:  Nada "Officially" Acknowledges Mr. Miranda as an Integral Employee, But Still Does Not Pay Him.**

26.     On November 29, 2018, Nada sent an "offer letter" to Mr. Miranda that opened with the phrase:  "Welcome…*officially*….to nada!" — openly acknowledging the fact that Mr. Miranda had already been working for Nada for some time.

27.     The letter gave him the title of "Chief Marketing Officer."  It laid out the "structure, term, and work arrangement" of the role, as well as his responsibilities and expected targets. It set forth the expectation that he work "a minimum of 40 hours per week."

28.     As compensation for this job, Nada only agreed to give Mr. Miranda 30,000 unvested - and at that time valueless - shares in Nada (equal to 3% of the shares at that time, with a par value of approximately $30.00).[1]  Nada pitched some unspecified, future "salary opportunities," and a "pathway" to "salaried employment after the Series A round."  It did not, however, actually pay Mr. Miranda a salary during this time period.

29.     Unlike the initial work period (07/01/2018-12/01/2018), Nada has not claimed that Mr. Miranda was an independent contractor or an "intern" during this time.   He was given an offer for an integral, full-time role at Nada.

30.     Mr. Miranda was legally entitled to be paid at least $7.25 per hour for his work during this time (e.g., at least $4,640.00 for 40 hours/week during the time period of 12/01/2018-04/15/2019).  He also worked approximately 330 overtime hours during this period, and therefore should have been paid an additional $3,588.75 in overtime pay.  Instead, Nada paid him nothing.[2]

31.     As set forth above, Nada did not do this in in good faith - it *knew* it should be paying Mr. Miranda, and it had no reasonable grounds for believing that this choice was not a viola-

---

[1] Equity does not count as "wages" under the FLSA.  29 C.F.R. § 531.32(b); 29 U.S.C. § 203(m).

[2] Mauricio Delgado, one of the co-owners of Nada, made several "under the table" cash payments to Mr. Miranda between November 2018 and March 2019, totaling $5,000.  These payments came from Mauricio's personal account, not from Nada.  Discovery is needed to determine whether any of these payments may be counted as an offset against the wages owed by Nada to Mr. Miranda.

tion of the law.  Mr. Miranda told the company on several occasions during his employment that it was unlawful not to pay employees for their work.  Nada ignored him.

32.     Nada's FLSA violation was willful.  It either knew, or showed reckless disregard as to whether, this choice was unlawful.   Mr. Miranda therefore invokes the FLSA's 3-year statute of limitations for this violation. 29 U.S.C. § 255(a).

**March 28, 2019:  Nada Finally Begins to Pay Mr. Miranda for his Work.**

33.     As of March 28, 2019, Nada finally got Mr. Miranda set up on its payroll system and began making traditional wage payments to him.  He was paid a gross salary of $1,500 for March 28, 2019 to April 25, 2019 (i.e., just $50 above minimum wage for those 5 weeks, and less than the minimum wage required to meet the "salary basis" test).

34.     Beginning on April 25, 2019, his salary was raised to $3,000 per month.

35.     Mr. Miranda received some additional payments during 2019 based on consulting work he did for a third party financial services company.

36.     He worked for Nada for the next year without incident, receiving nothing but positive feedback for his work.

**Early 2020:  Nada Proposes a Raise for Mr. Miranda**

37.     In early 2020,  Nada promised Mr. Miranda an increased equity award and increase in salary.  John (CEO) & Mauricio (CSO) stated that they wanted him to put something in writing as to the "Fair Market Value" of his contributions to the company.   So, on March 12, 2020, he wrote them a proposal for his requested compensation going forward.

38.     In his letter, Mr. Miranda pointed out that his work over the preceding years had resulted in several objective achievements for Nada.  Mr. Miranda designed a unique brand for the company, designed a custom website, secured partnerships (including the University of Texas at Austin, Google Cloud Spark, and Aceable), helped to actualize several of the team's product ideas (such as the Indi & Home Eco application), provided daily administrative support in the corporate office, wrote job descriptions and conducted interviews for new hires, and worked closely with the CEO and CSO on materials to be used in investor meetings.

39.     Mr. Miranda offered his research on "market" rates for the type of job he was performing and suggested an annual compensation package of $130,000.000.

**March 30, 2020: Nada Places All Employees on "Furlough" & Tells Them to Collect Unemployment Benefits.**

40.     On March 30, 2020, John Green (CEO) issued a furlough letter to all Nada employees, "due to the impact of the Coronavirus (COVID-19)."  The letter stated that they would reconvene on April 13, 2020 "to reassess the circumstances and make any further determinations necessary."

41.     The letter stated: "During this furlough you may be eligible for unemployment compensation," and it provided the website link to apply for benefits with the Texas Workforce Commission.  Mr. Miranda was also verbally encouraged to apply for these benefits on a call with John & Mauricio.  They told him he'd be 'better off " collecting unemployment, because he'd get more money than his Nada salary.  Mauricio stated that even he was planning to collect these benefits and told Mr. Miranda that this was the best course of action.  He explained that

everyone except for John Green would would be furloughed and encouraged to seek unemployment benefits.

42.     Following the company's advice, Mr. Miranda applied for, and received, unemployment benefits.  He also received the extra $600 per week in Federal Pandemic Unemployment Compensation (FPUC) from the U.S. federal government under the CARES act.  He made this claim for funds from the federal government at the express instruction and encouragement of Nada.

43.     Mr. Miranda was told that the other two employees - Mauricio Delgado and Jennifer Ziemkiewicz - did the same.

44.     Green continued to operate the company during this time.

**April 29, 2020:  Nada Gives Mr. Miranda a Performance Review (While He Was "on Furlough").**

45.     On April 29, 2020, Nada responded to Mr. Miranda's "fair market value" letter. They gave him a "performance review," which included some areas for improvement, but the letter was all positive in tone.  It noted: "You've done a great job in this area and provided delivered real value to the Company," and "we believe you will continue to naturally grow in this area over time as you gain relevant experience and exposure."

46.     Nada proposed $63,540 as a "fair market value" for an annual salary.  They stated: "We are happy to extend the following offer for you," and expressed the hope that Mr. Miranda would "continue being a critical team member in building the Nada brand."  Nada's response letter closed with the statement: "We will draft a proper offer letter, employment agreement and related documentation following our meeting."

47.     On May 4, 2020, Mr. Miranda attended a meeting with John & Mauricio to discuss Nada's April 29th response letter, despite being "on furlough" during this time.

**April-May 2020:  Nada Receives $116,750 in PPP and SBA Loans.**

48.     Nada applied for, and received, $116,750.00 in loan funds from the  SBA and the Paycheck Protection Program ("PPP").

49.     The PPP program was meant to encourage employers to rehire any staff that they had to lay off or furlough due to the initial impacts of COVID-19.

50.     Despite receiving these substantial funds, Nada did not rescind Mr. Miranda's "furlough" status.

**Late May 2020:   Nada Asks Mr. Miranda to Begin Working Again, but Keeps Him on "Furlough" & Tells Him to Keep Collecting Unemployment Benefits.**

51.     Then, on or around May 2020, John & Mauricio reached out to Mr. Miranda and said "we got some PPP loans, so we should be OK for a bit.  We're getting ready to launch on Republic, so let's get together and start working on that again."  Mr. Miranda asked how things would work with compensation.  He was told it would be fine to just keep doing what they were doing. (i.e., collecting unemployment benefits instead of being paid by Nada for the work he was performing).

52.     From June 2020 until September 2020, Nada was reaping the benefits of  Mr. Miranda's time and efforts, while the state & federal governments footed the bill - the same type of scheme they had perpetuated when they first hired Mr. Miranda in 2018 (encouraging him to collect benefits from a third party, rather than paying him for his work).

53.     Mr. Miranda worked 40+ hours per week during this time period.

54.     In sum: Nada was once again benefiting from Mr. Miranda's continued work time and efforts, without having to pay him anything - because they'd decided that the state & federal governments could pay Mr. Miranda instead.   And on top of that windfall, they received even *more* money from the federal government in the form of a forgivable PPP loan.   They used that money to line the company's pockets, instead of putting furloughed employees back on payroll.

**Summer 2020: Nada Makes Public Representations About its Financial Status, With the Purpose of Attracting Investors.**

55.     On June 16, 2020, Nada filed its "Form C: Offering Statement" with the SEC.   It indicated that it had "four employees" at that time and made no mention of any negative business impacts related to COVID-19.   Instead, it stated that it planned to "[f]ully launch our mortgage service vertical," "[e]xtend the functionality of our digital platform," "[g]row market-share with-in the Dallas-Fort Worth market," "[e]stablish a partner channel to extend the Nada digital plat-form to other independent real estate brokerage companies," "[e]xpand to additional markets," and more, within the next 12-18 months.

56.     The SEC filing noted that: "As of May 31, 2020, the Company had $152,053 in aggregate cash and cash equivalents, leaving the Company with approximately six months of runway."   It did not mention that several employees were not being paid their salaries during this time.

57.     The SEC filing also claimed that Nada owed only $671.00 in payroll taxes for 2018, and $306.00 in payroll taxes for 2019.   Both statements were false, in that Nada failed to

pay the required payroll taxes on any payments made to Mr. Miranda during those years and therefore owes the IRS far more than $977.00.

58.     On June 17, 2020, Nada launched its crowd fundraising campaign on Republic.co.

59.     On July 7, 2020, the Company reported continued revenue growth on republic.co.

60.     On or around August 17, 2020, Nada hired Micah Lindsey into the role of "VP of Operations," while Mr. Miranda was still being kept on unpaid "furlough" status (despite continuing to work).

## July-August 2020: Mr. Miranda Forms a Good Faith Belief that Nada Was Misusing Federal Funds & Misleading Investors.

61.     By the end of the summer, Mr. Miranda became concerned about the legality of several of Nada's actions.

62.     At this time, he had been "furloughed" and told to collect unemployment benefits, despite performing regular work for the company.   He observed that Nada had received PPP funds, but the funds were not being used to maintain headcount.[3]   He also knew that he had worked without pay for long periods and had been improperly paid "under the table" in 2018 - but that situation wasn't being corrected, and it wasn't being disclosed.   And he felt that Nada was painting a financial picture for the SEC and investors that was a bit rosier than reality.

63.     In late July or early August 2020, Mr. Miranda began to tell Mauricio Delgado about his concerns.   Specifically, he told Mauricio, "this is weird, we got PPP loans and they aren't being used for us."

_____

[3] Discovery is needed to determine whether Nada's use of PPP funds was, or was not legal - but the pertinent point for purposes of Mr. Miranda's retaliation claim herein is that Mr. Miranda's belief that the company's use of funds was unlawful was a good faith belief.

**September 4, 2020:  Nada Gives Mr. Miranda a New Job Title and Expresses a Plan to "Move Forward" With Mr. Miranda in This New Role.**

64.     Shortly thereafter, on September 4, 2020, John and Mauricio set up a meeting with Mr. Miranda to discuss a change in job title. Mr. Miranda would now be working under Micah Lindsey, the recently hired VP of Operations.

65.     A few days later, John Green sent Mr. Miranda an email asking him to send a task list, "in order to help us <u>move things forward</u> within your new role."  He explained that a goal was to "establish a more transparent and focused workload assignment process <u>go forward</u>" - clearly indicating an intent to keep Mr. Miranda on board with Nada as of this date.

**September-October 2020:  Mr. Miranda Levels More Serious Charges Against the Company, and is Promptly Fired.**

66.     Due to his growing concerns about the company's actions, on September 9, 2020, Mr. Miranda filed a complaint against Nada with the SBA's Office of Inspector General for suspected PPP fraud. That agency has the authority to regulate and investigate the fraudulent use of United States federal funds.

67.     He also continued to verbally express his concerns to Mauricio Delgado during this time.

68.     On October 9, 2020, Mr. Miranda tried again to raise his concerns to Nada leadership, this time in writing.  He sent the following email to John and Mauricio:

*Good morning John & Mauricio,*

*I hate to be writing this, but I really feel that I have to be honest with you and the company.  I am really concerned about some of the activities over the past six months or so.*

*I've been working for Nada Holdings, nearly full time.  But I haven't been paid for any of that work.  Instead, I've been told that I'm on "furlough."  The TWC has basically been paying my salary instead of the company, even though I've been instructed to keep working for the company.  That doesn't seem right, and I'm worried this could somehow be unlawful.*

*And while I'm not 100% sure what was written on the company's PPP application or forgiveness paperwork, my understanding is that those loans were supposed to be used for payroll costs.  None of us, with the exception of John, have been paid since the pandemic started, so I'm not sure how the company could say that the PPP money was used for payroll.*

*I started to worry about this and did some research.  I'm really concerned that the company may have submitted a false claim to the government, and this could get the company into trouble.  There are also laws about having to pay employees for all work they perform, even if it's just minimum wage.  The company hasn't been doing this.*

*This especially troubles me since we're continuing to seek investors, and will be making representations to them about the company's financial status and viability.*

*I really think you both need to clean this up, and be upfront with investors and shareholders about the situation.  If not, I fear the company could get into trouble for misleading them.  I think the law is pretty clear that we have to pay everyone for the work they've performed (myself included), even if that has some negative tax implications for the company.  It's better to clean it up now and tell investors that Nada will probably have some debts/obligations to take care of in this regard, but that it will ensure full legal compliance going forward and they won't have anything to worry about.  If not, investors could come back later and claim to have been misled.*

*Do you agree?*

69.     John Green opened Mr. Miranda's email that same-day.  His immediate response was to remove Mr. Miranda as a "co-founder" on Republic.co/nada

70.     A few days later, on October 12, 2020, Nada revoked Mr. Miranda's access to the company's Hubspot CRM, Salesforce CRM, his Nada email account, and the Facebook Business account.  The writing was clearly on the wall at this point.

71.    That same day, John Green responded to Mr. Miranda's email:  "we will review your email shortly."

72.    On October 15th, Mauricio (CSO) asked Mr. Miranda in a group text with John (CEO) to meet them at the office the next day.

73.    On October 16th, the three men held a remote video meeting.  During that meeting, John Green confirmed what had already become clear to Mr. Miranda - he was being fired, and would be asked to stay quiet about the issues he had raised.  John stated:

> *"We feel it's become clear that this is no longer working for any of us. And we just hope to address the matter professionally and to avoid any unnecessary fuss"* ...

74.    On October 29, 2020 John Green followed up, and sent Mr. Miranda a separation document.  That document set forth a separation date of March 27, 2020 — not October 2020 when Mr. Miranda was actually fired.  Mr. Miranda disagreed with this, because he had been working full time for Nada during May through October, and he knew he was owed wages and vested equity for that time.  As a result, he declined to sign the document.

**October-November 2020:  Nada Goes on the Attack Against Mr. Miranda, to Deflect  Attention From its Own Wrongdoing.**

75.    On October 29, 2020, after his termination, Mr. Miranda e-mailed John & Mauricio:  "I was hoping that you could help me with issuing payment for my earned real estate commissions at your earliest convenience."  He gave a list of the "deals that ha[d] been completed and payment issued to Nada Realty TX LLC according to [his] records."[4]

---

[4] Separate from his employment with Nada Holdings, Inc., Mr. Miranda worked as an Independent Real Estate Agent for Nada's affiliate, Nada Realty.  His independent contractorship was also terminated at this time. This Complaint does not assert any claims against Nada Realty, or any claims related to the termination his contract with Nada Realty.

76.    On October 29, 2020, John responded: "Hi Felipe, We are in receipt of your email and we have logged each of these transactions." He confirmed the commissions that Mr. Miranda would be paid for each of the deals.  He stated, however, that Nada would not issue these earned commission payments until they first got "closure" regarding several pieces of company property - specifically, a 3-D Digital Camera, a Fuji Digital Camera battery charger, a Digital Camera tri-pod, a Digital Camera microphone accessory; and some parts to an electronic adjustable desk. He accused Mr. Miranda of being in possession of these items.

77.    It should not have come as a surprise that Nada had misplaced items.  In late August or early September 2020, Nada moved to a new office space. They were renovating and moving things until October.  They did not hire anyone to help move, and instead made repeated back-and-forth trips in their own cars. The process was unorganized, and several things were misplaced.

78.    Mr. Miranda responded on November 3, 2020, as follows:

◦    As for the "3D Digital Camera,"  Mr. Miranda informed them: "This is not in my possession. Last known location is at the office or with an agent."

◦    As for the "Fuji Digital Camera battery charger,"  Mr. Miranda informed them that it was returned along with Fuji Digital Camera on 10/14/20 via UPS 1Z45R1X70354574095."

◦    As for the "Digital Camera tripod," Mr. Miranda reminded them that "This tripod was personal property, not company property."

◦    As for the "Digital Camera microphone accessory," Mr. Miranda informed them: "This is not in my possession. Last known location is at the office."

◦    As for the "Parts to the electronic adjustable desk," Mr. Miranda informed them: "All parts of the desk are in the office along with the desk."

79.     On November 13, 2020, John Green responded: "We've completed a thorough review of our new office as well as the prior WW offices and are unable to locate the following items which were known to be last in your possession."  He listed the same things that Mr. Miranda had already previously said were not in his position (the 3D Digital Camera, the Digital Camera microphone accessory, and some Parts to an electronic desk).  He also asked for Mr. Miranda's office keys.  He said: "feel free to help us search the office or visit WW to recover these lost items. If you're unable to locate these, we can adjust your commission payments to recover the losses."

80.     That same day, Mr. Miranda responded that he had sent the office key to them via certified mail, and gave a tracking number. He then stated: "Like I mentioned in my last email, I do not have these items in my possession and I do not agree with having their costs deducted from my paycheck. If you guys decided to make a deduction, that is of course up to you, even if I disagree. I just need to get my commissions paid out.  Please let me know the timing on this and what else you need from my end."

81.     John responded that same day: "We will proceed with processing payments offset by the cost of the missing items. In advance, I'll provide you an itemized list with the associated replacement costs."  This never happened.

82.     On November 27, 2020, Mr. Miranda followed up via email: "John & Mauricio, Hope you had a good Thanksgiving. Can you please provide an update on my commission payment. I haven't heard from you since November 13th."

83.     In that email, he also asked: "I have a question about the reason for my termination. I assume that you guys just wanted to part ways after I sent my email with my concerns,

because you see things differently. But when I apply for other jobs in the future, I'm sure they'll ask me the reason for the separation, and I'm not entirely sure what I should say here."

84.    On Monday, November 30, 2020, John responded and said he "will provide a response this week."  He did not respond to Mr. Miranda's question about the reason for his termination.

85.    Instead, on Wednesday, December 9, 2020, Nada had its attorney send a threatening letter to Mr. Miranda.  It groundlessly accused him of engaging in "various illegal activities," and violating "various federal and state laws."

86.    The letter repeated the accusation that Mr. Miranda was "in possession of property belonging to the Company," even though Mr. Miranda had already given everything back that was in his possession (see above). It then claimed that Nada "ha[d] learned" and to "ha[ve] become aware" of various instances where Mr. Miranda did something improper during his employment.

87.    All of these accusations were objectively, and demonstrably (via email and other records) false.  It was a clear attempt to strong-arm Mr. Miranda into staying quiet.  None of these accusations had ever been leveled against him, or brought to his attention, until after he "rocked the boat."

## November 2020:  Nada Continues to Engage in the Same Misleading Activities that Mr. Miranda Had Warned Them About.

88.    On November 24, 2020, Nada filed an Amended "Form C" with the SEC.  Under the disclosure section titled "Litigation," they wrote: "None."  They did not update their total current liabilities, despite the fact that Mr. Miranda had informed them that he was owed wages,

and warned them that "investors could come back later and claim to have been misled" if those liabilities were not disclosed.

89.     To date, Nada's profile on republic.co still lists the following individuals as people who are "helping build Nada" - Felipe Miranda, Jared Verzello, Raul G., Amit Godbole, Pragati H, Sudama K, and Davies Thalakottor.   None of these individuals are still involved with Nada.  Listing them on Republic.co as persons who are currently "helping" to build the Company is misleading, and suggests that the company is bigger than it really is.

90.     By March 2, 2021, Nada has raised $1.07 million—the maximum amount allowed by the SEC for the public equity offering.  It has done so without disclosing to anyone the potentiality liabilities pointed out by Mr. Miranda, and without disclosing the active legal dispute between Mr. Miranda and the company about his wages.  It has provided "No risk disclosures" on republic.co (its main fundraising platform), and has not notified the SEC about the legal liabilities it is facing.


## IV.  CAUSES OF ACTION

### Count 1:
### Retaliation under the FALSE CLAIMS ACT

89.     On October 16, 2020, Defendant fired Plaintiff because he voiced concerns, began investigating, initiated a charge, or began other lawful acts in furtherance of an action for fraud against the United States Government.  Specifically, Plaintiff raised complaints of PPP fraud and CARES Act unemployment fraud, and filed a complaint of PPP fraud with the SBA.

90.     Plaintiff's complaints were based on his good faith belief that unlawful activity was taking place.

91.     This protected activity was the cause of, or a motivating factor in, Defendant's decision to terminate Plaintiff's employment when it did.

92.     Defendants' actions in firing Plaintiff when it did, for these reasons, were a violation of the FALSE CLAIMS ACT.  31 U.S.C. §3730(h).

## Count 2:
## Retaliation under the FAIR LABOR STANDARDS ACT

93.     On October 16, 2020, Defendant fired Plaintiff because he voiced concerns about the company's failure to pay him wages as required under the FLSA.   Specifically, he raised complaints about the company's failure to pay him at least minimum wages for periods in 2018, 2019, and 2020.

94.     Plaintiff's complaints were based on his good faith belief that the company's failure to pay at least minimum wage was unlawful.

95.     This protected activity was the cause of, or a motivating factor in, Defendant's decision to terminate Plaintiff's employment when it did.

96.     Defendants' actions in firing Plaintiff when it did, for these reasons, were a violation of the FAIR LABOR STANDARDS ACT, Section 15(a)(3) ("it is a violation for any person to "discharge…any employee because such employee has filed any complaint….under or related to this Act").[5]

---

[5] Because section 15(a)(3) prohibits "any person" from retaliating against "any employee", the protection applies to all employees of an employer even in those instances in which the employee's work and the employer are not covered by the FLSA. (https://www.dol.gov/agencies/whd/fact-sheets/77a-flsa-prohibiting-retaliation)

## Count 3:
## Failure to Pay Minimum Wage & Overtime

97.     By the acts and omissions set forth herein, Defendant has violated Plaintiff's rights under the FLSA. Specifically, it failed to ensure that he was paid at least minimum wage for each hour of work that he performed for Defendant, or that he was paid overtime for each hour that he worked over 40 hours per week.

98.     Defendant's violation of the FLSA was willful. It had reason to know (through complaints from Mr. Miranda) that it was supposed to be paying its employees for their work.

99.     Plaintiff seeks to recover an amount equal to the difference between: (a) what he would have earned if Nada had paid him the required minimum wage for each hour worked by him, and (b) what he actually earned instead, together with an equal amount as liquidated damages.

100.     Plaintiff further seeks to recover his attorney's fees, costs, and pre- and post-judgment interest at the highest rate allowed by law.

101.     Nada's FLSA violation was willful.  It either knew, or showed reckless disregard as to whether, the choice not to pay Mr. Miranda for his work was unlawful.  Mr. Miranda therefore invokes the FLSA's 3-year statute of limitations for this violation. 29 U.S.C. § 255(a).

## Count 4:
## Request for Declaration of Ownership of Shares

102.     As set forth in Paragraph 28, above, on December, 1 2018, Mr. Miranda was given 30,000  shares  of common stock of Nada Holdings, Inc.

103.     In the "Restricted Stock Award Agreement" governing this award (the "Award Agreement"), Nada agreed to "issue, as promptly as practicable, a stock certificate, registered in the name of the Grantee, reflecting the Shares."  It did not do so.

104.     Mr. Miranda's shares were released from the repurchase option under the following schedule:

- "one-fourth (1/4) of the Shares (7,500 Shares) shall be fully vested and released from the Repurchase Option on the first anniversary of this Agreement," (i.e., on December 1, 2019); and

- "an additional 1/48th of the Shares shall be released each month thereafter."

105.     As a result, after October 1, 2020, 15,000 of Mr. Mirandas shares were considered "vested," and not subject to the Repurchase Option.   The other 15,000 shares were considered "unvested" as of that time, and still subject to the Repurchase Option.

106.     The Award Agreement provided that "In the event the Grantee ceases to be an officer of, or otherwise serve the Company (a "Service Provider")," Nada would have the right, "for a period of 90 days from the date the Grantee ceases to be a Service Provider, to repurchase any Shares which have not yet been released from the Repurchase Option."

107.     The Repurchase Option could be exercised by the Company "by delivering written notice to [Mr. Miranda]…and, at the Company's option, (i) by delivering to the [Mr. Miran-

da] a check in the amount of the aggregate Repurchase Price, or (ii) by canceling an amount of

[Mr. Miranda's] indebtedness to the Company equal to the aggregate Repurchase Price."

108.    Mr. Miranda "cease[d] to...serve" Nada Holdings Inc. on October 12, 2020, when

Nada revoked Mr. Miranda's access to the company's Hubspot CRM, Salesforce CRM, his Nada

email account, and the Facebook Business account.  At the latest, Mr. Miranda "cease[d] to…

serve" Nada Holdings Inc. on October 16, 2020, when Nada "officially" fired him via remote

video call.

109.    Ninety days after Mr. Miranda "cease[d] to...serve" Nada Holdings Inc. ran on

January 10th, or at the latest, January 14th, 2021.

110.    On January 19, 2021 - five to nine days after the expiration of the 90-day repur-

chase period - John Green sent an email to Mr. Miranda stating: "The Company hereby exercises

its Repurchase Option to repurchase 100% of your unvested shares at the original issue price

pursuant to the terms of the Stock Restriction Agreement that you entered into the company on or

about December 1, 2018."

111.    To date, Nada has not actually issued any payment for this attempted repurchase.

112.     The Award Agreement also provided that if Mr. Miranda was terminated without

Cause, 50% of the Unreleased Shares shall be immediately released from the Repurchase Option.

Nada has never asserted that Mr. Miranda was fired for "Cause."

113.     Mr. Miranda responded via counsel on February 11, 2021, noting that Mr. Miran-

da did not recognize this attempted repurchase, for the reasons set forth above.  He requested a

copy of the stock certificates (or other documentation of ownership) for all of his vested shares.

To date, Nada has not provided the stock certificate.

114.     Miranda seeks a declaration under the Texas Uniform Declaratory Judgment Act

that he is the owner of 30,000 vested shares of common stock in Nada Holdings, Inc.

115.     Mr. Miranda is "a person interested under a...written contract...whose rights, sta-

tus, or other legal relations are affected by [the]...contract," and he therefore seeks to have the

foregoing issues regarding the construction or validity of that contract determined by the Court,

and to obtain a declaration of his rights, status, or other legal relations thereunder.

116.     A justiciable controversy exists as to the rights and status of the parties, which

would be resolved by the declaration sought.

## V.  DAMAGES

117.  Plaintiff incorporates the preceding facts as if fully set forth herein.  As a direct and proximate result of Defendants' conduct, Plaintiff seeks to recover for the following injuries and damages:

a.  An award equal to two times the minimum wage and overtime wages owed for the periods in 2018, 2019, and 2020 when Plaintiff worked for Defendant without pay, or with less than minimum wage pay;

b.  Two times back pay for his period of unemployment after October 16, 2020, plus interest.  31 U.S.C. §3730(h); 29 U.S. Code § 260;

b.  Reinstatement or front pay;

c.  Compensatory damages;

d.  Damage to reputation in the past and future;

e.  Mental anguish in the past and future; and

f.  An award to Plaintiff for such other relief, legal or equitable, as may be warranted.

j.  As it was necessary for Plaintiff to h ire the undersigned attorney to file this lawsuit, upon judgment, Plaintiff is entitled to an award of attorney fees and costs under 42 U.S.C. §1988(b); 31 U.S.C. §3730(h); and 29 USC § 216(b).

## VI.
## DEMAND FOR JURY TRIAL

118.  Plaintiff asserts his rights under the Seventh Amendment to the United States Constitution and demands, in accordance with FEDERAL RULE OF CIVIL PROCEDURE 38, a trial by jury on all issues.

## PRAYER

WHEREFORE, Plaintiff requests that upon trial of this cause, that Plaintiff have judgment as authorized by law, and Plaintiff further requests general relief.

*Respectfully Submitted,*

Tremain Artaza PLLC


By: _/s/  Ashley E. Tremain_____.
    ASHLEY E. TREMAIN
    State Bar No. 24066209
    ashley@tremainartaza.com

13140 Coit Rd., Ste. 104
Dallas, TX 75240
Tel: (469) 573-0271
Fax:  (214) 254-4941

**ATTORNEYS FOR PLAINTIFF**
**FELIPE MIRANDA**